FRED W. JONES, Jr., Judge.
After a jury trial the defendant, Donald Ray Love, was found guilty as charged of second degree murder (R.S. 14:30.1) and sentenced to life imprisonment at hard labor without benefit of parole. On appeal, defendant filed three assignments of error, one of which has been abandoned.

Context Facts

On July 1, 1981, during the course of an argument defendant struck his common-law wife, Sandra Ford, in the face and threatened her with a knife. The police were called and, at the request of Ms. Ford, directed defendant to leave the premises. Defendant complied with this order but returned a short time later, after the officers departed. Present in the dwelling at that time were Bobbette Ford, 15 year old daughter of Ms. Ford, and the youngster’s boyfriend, Ricky McMillan. Ms. Ford had decided to leave and stay away until defendant had time to “cool off”.
Defendant went into the kitchen, placed some meat in a skillet, and for a considerable period of time simply prodded the meat with a knife — without attempting to cook it. He was also observed “talking to the floor” in the living room. Defendant asked Bobbette several times who had called the police about him.
After a time McMillan left the house and started walking to a nearby grocery store with a friend, Morris Sutton. The two encountered a couple of females and engaged in conversation with them. Defendant joined the group and started walking up the street with McMillan and Sutton. After walking a short distance, without any apparent provocation, defendant pulled out a “buck” knife (with a 3½" blade) and stabbed McMillan once in the left upper chest. The youth staggered over into a wooded area, while defendant continued walking up the street.
A Shreveport police officer later arrived on the scene, found the victim where he had collapsed, and had him taken by ambulance to L.S.U. Medical Center where he died after emergency surgery. It was discovered that the stab to McMillan’s chest had pierced his aorta and heart, thus causing his death. The murder weapon was never recovered.
That night defendant went to the house of an aunt in Shreveport and told relatives he thought he had killed a man. Defendant requested that his aunt call the police and expressed an intent to go to the VA hospital the next morning. However, before he could leave for that facility the police arrived at the aunt’s house and, pursuant to a warrant, placed defendant under arrest.
After being indicted by a grand jury for second degree murder, defendant entered a plea of not guilty and not guilty by reason of insanity. A sanity commission was appointed to examine defendant. Following a sanity hearing, defendant was found to be mentally incompetent and committed to the Feliciana Forensic Facility, where he remained for four months. At a subsequent sanity hearing, on May 14, 1982, defendant was found to be mentally competent to proceed. Jury trial was held September 27 through October 5, 1982.
ASSIGNMENT OF ERROR NO. 1
Defendant contends in this assignment that the trial judge erred in denying his challenge for cause of the prospective juror Malee because of the latter’s “affinity with the District Attorney’s office.” Defendant exercised a peremptory challenge to excuse Malee and subsequently exhausted his peremptory challenges before completion of the panel.
During the voir dire it was revealed that Malee had known the prosecuting attorney for some 15 years; the two attended the same church; one of Malec’s daughters and the prosecutor attended the same high school during the same years; and the prosecutor was acquainted with Malec’s son who worked in the office of the Caddo Parish Sheriff.[1]
*450 Malee denied that his acquaintance with the prosecutor would influence in any way his verdict if accepted as a juror in the case.
A juror is subject to challenge for cause if his relationship with the prosecutor is such as to lead to the reasonable conclusion that his verdict would be influenced thereby. La.C.Cr.P. Art. 797. However, in the determination of a juror’s competency we defer to the trial judge’s discretion in the absence of an arbitrary or unreasonable exercise thereof which prejudices the defendant’s right to a fair and impartial trial. State v. Weathers, 320 So.2d 895 (La.1975).
In view of Malec’s rather casual acquaintance with the prosecutor, there was no reason to disbelieve his assertion that this relation would not influence his verdict. Therefore, the trial judge did not abuse his discretion in denying the challenge for cause.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 3
Defendant argues in this assignment that “a rational trier of fact could not have found it was more probable than not that defendant was sane at the time of the offense.”
The test for legal insanity in this case is: if the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be except from criminal responsibility. La. R.S. Art. 14:14.
The defendant in a criminal case is presumed sane and the state is not required to prove sanity. La.R.S. 15:432. A defendant who desires to negate the presumption must put forth an affirmative defense of insanity and prove that insanity by a preponderance of the evidence. La.C.Cr.P. Art. 652.
When a defendant pleads the affirmative defense of insanity, is convicted, and on appeal claims the record evidence does not support the trial court’s finding on the sanity issue, we must use the Jackson standard[2] to determine whether under the facts and circumstances of the case a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Roy, 395 So.2d 664 (La.1981).
In support of his insanity plea defendant first presented the testimony of family members who related examples of consistent bizarre behavior on his part over the past years. An uncle stated that during the time defendant was living with him, he would often shout during the night that “something was after him.” On one occasion the defendant began digging in the yard, explaining that he was “digging up his father.” Another incident involved defendant’s shaving his head and eyebrows, putting on makeup and declaring that he was Jesus Christ.
Defendant also presented the testimony of three psychiatrists: Dr. Joe Ben Hayes, Dr. William E. Wilkinson and Dr. Linda Boswell. In addition to interviewing the 25 year old defendant, Dr. Hayes reviewed psychiatric reports compiled on him (including military service records) over the previous ten year period. Diagnosing defendant as suffering from paranoid schizophrenia, Dr. Hayes elaborated:
“I believe that this disease has become overt and fully developed sometime in his very late teens or early twenties, that sometime around 1977 it was first recognized and diagnosed in a psychiatric unit. When under stress, he tends to be psychotic; reacts to environment with delusional thinking where he feels extremely persecuted and turned against.”
This psychiatrist opined it was “highly probable he was psychotic a major part of the day [of the killing] and most probably at the time the knifing occurred” and “it was highly probable that he did not know right from wrong concerning his act at the time he stabbed the man.”
*451 Dr. Wilkinson, a member of the sanity commission, examined defendant on November 4, 1981 and April 2, 1982. He concluded that defendant suffered from a chronic schizophrenic disorder, characterized by grandiose delusions. Elaborating, this psychiatrist added:
“... this man is clearly insane and ... odds are that at the time of the alleged offense, with the verifiable history of his building up of tension before ... and that he was insane at the time of the alleged offense.”
In August 1979, while in her residency program at the L.S.U. Medical Center, Dr. Boswell treated defendant for a mental problem which was classified as a schizo-affective disorder with grandiose delusions. If defendant was still afflicted with this disorder at the time of the offense, Dr. Boswell did not believe he would perceive his criminal behavior as being wrong.
In its rebuttal evidence on the sanity issue, the state presented testimony from both lay and expert witnesses. Ms. Ford, who had lived with the defendant for several months, stated that he had a bad temper when drinking alcoholic beverages and often appeared nervous, but denied ever observing defendant engaging in bizarre behavior. She also testified that the defendant disliked Ricky McMillan because of the youth’s relation with Bobbette. The latter asserted that defendant had made sexual advances toward her, which she rejected, but about which she had informed McMillan.
Morris Sutton, a witness to the stabbing, had watched the defendant playing dominoes earlier in the day, prior to the offense. Sutton could recall no unusual behavior on defendant’s part — except perhaps his walking back and forth about 100 yards after accusing other participants in the domino game of cheating him.
The police officer who evicted defendant from the Ford premises about two hours before the stabbing described him as appearing angry but presenting no problems at that time. The arresting officers the following morning found the defendant to be calm and coherent. After first denying knowing the victim, defendant changed his story, admitted the stabbing, and explained that McMillan had been “messing with him” and “laying up” with Bobbette. He asserted that he had intended merely to hurt McMillan rather than kill him and that he had thrown the knife into some bushes because he planned to lie about the incident.
Psychiatrists testifying on behalf of the state were Drs. Norman Mauroner (member of the sanity commission), Charles Arm-stead and Shahidul Islam.
Based upon an interview with the defendant, a review of his medical records, and evidence of defendant’s conduct on the day of the offense, Dr. Mauroner was of the opinion that defendant knew right from wrong at the time of the stabbing. He explained that it is possible to suffer from paranoid schizophrenia and still be legally sane. The testimony of Dr. Armstead was substantially the same as that of Dr. Mau-roner.
Dr. Islam, a professor of psychiatry at L.S.U. Medical School, also had treated patients at the V.A. Hospital in Shreveport since 1978. He saw the defendant on a number of occasions in the spring of 1981. Dr. Islam testified that when he discharged the defendant from the hospital on June 4, 1981, he observed no evidence of a “thinking disturbance” or of active psychosis. Although defendant’s mood was stable, the prognosis was guarded because of the patient’s drinking problem. Defendant was described by this psychiatrist as having an anti-social personality characterized by an absence of guilt feeling about wrongdoing. Despite this, Dr. Islam felt that defendant knew the difference between right and wrong.
Considering the totality of this record evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found that defendant did not prove his insanity at the time by a preponderance of the evidence.
This assignment is without merit.
*452 DECREE
For the reasons set forth, defendant’s conviction and sentence are affirmed.

. Defendant did not assert this last fact as a basis for challenging Malee for cause.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).