530 So.2d 1253 (1988)
STATE of Louisiana, Appellee,
v.
Kenward W. PIER, Appellant.
No. 19716-KA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
Rehearing Denied September 15, 1988.
*1254 Indigent Defender Office by William T. Giddens, Richard E. Hiller, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Howard M. Fish, Tommy J. Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before HALL, C.J., and SEXTON and LINDSAY, JJ.
HALL, Chief Judge.
Defendant, Kenward W. Pier, Sr., was convicted by a jury of second degree murder in violation of LSA-R.S. 14:30.1. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. His appeal presents three assignments of error.[1] Finding no merit to these assignments, we affirm.

FACTS
During the evening of Saturday September 21, 1985 Angela Pier was stabbed to death by her husband, Kenward, in the bedroom of their home in Shreveport, Louisiana. Angela and the couple's four children had returned home that afternoon after spending the previous two weeks with Kenward's relatives. During this absence, Angela had initiated proceedings with the coroner's office to have her husband committed to a substance abuse facility. She told an employee of the coroner's office that Kenward had a past history of drug abuse and was in need of care. She related that he had been acting strangely, had become very violent at times and that she had been forced to move from her home because she feared for her life and her children's lives. Angela was to have returned to the coroner's office to complete the arrangements but never did. She was killed two days later.
On the night in question, Angela and Kenward put their children to bed early and then retired to their bedroom. According to the defendant's statement they engaged in sexual intercourse. The couple argued about Kenward's drug problem and about extramarital affairs that Kenward *1255 believed Angela was participating in. At some point in the discussion, Kenward bound and gagged Angela, beat her about the face repeatedly, and stabbed her 69 times with a large serrated edge knife with a wooden handle. The coroner's report listed the cause of Angela's death as shock due to blood loss from the multiple stab wounds.
Two of the children, Kenward, Jr. and Drawnek, testified at the trial. They stated that they heard their mother screaming and calling out for help but that they were afraid to go to her aid. After Kenward finished attacking Angela, he showered and changed clothes. While he was dressing, Drawnek came into the living room and asked his permission to use the restroom. Defendant told her not go into her mother's bedroom. Drawnek saw blood on her father's hands and in the bathroom. After defendant left the house, Kenward, Jr. and Drawnek discovered their mother's mutilated body and fled with the two younger children to a neighbor's house.
Shortly after midnight, Kenward, Sr. was located at the family business office by his parents and he then went to the police station where he was taken into custody. Samples of defendant's blood and urine taken between 1:00 and 3:00 a.m. on September 22 revealed no alcohol or drugs. The thin-layer chromatography test used to analyze defendant's urine checked for phencyclidene (PCP) and other drugs but not marijuana. At approximately 5:00 a.m. defendant gave a statement to the police regarding the incident. He admitted arguing with his wife that night and at one point stated, "Alright, alright, I did it. I'm through.", but later in the same statement denied killing her. In a second statement given around noon on September 22, Kenward admitted killing Angela and gave a detailed account of the incident. He explained that he had a drug problem and that they were arguing about drugs. He stated:
"Well, we got into a fight and she scratched me and I hit her and she tried to stick me with a plunger and one thing led to another and I wind up killing her.
He explained that Angela had been "fussing" at him like he was her child and that he was "just sick and tired of that". He also stated, "My fury overtook me". He said that he always tried to be as peaceful as he possibly could but that he had just taken all he could stand. He stated:
"It was in me. I been praying on it, I had prayed on it, I prayed on it, I prayed on it, I prayed on it for six, six weeks ... I warned her four weeks ago and I warned her every week, everyday of the last four weeks."
Kenward, Sr., was indicted for second degree murder in connection with Angela's death. He pled not guilty and not guilty by reason of insanity. A sanity commission found defendant competent to aid in his defense and defendant proceeded to trial by jury. At trial, defendant never disputed the fact that he had killed his wife. The only issue before the jury was whether defendant was insane at the time he committed the crime.
Assignment of Error No. 1
By this assignment, defendant contends that the jury's verdict of guilty as charged of second degree murder was contrary to the law and evidence. He argues that he presented sufficient evidence to prove that he was "legally insane" at the time he killed his wife, and thus, the jury should have rendered a verdict of not guilty by reason of insanity.
In Louisiana there is a legal presumption that the defendant is sane and responsible for his actions. The state is relieved from the necessity of proving sanity but the presumption may be destroyed by rebutting evidence. LSA-R.S. 15:432. The defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. LSA-C.Cr.P. Art. 652. If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility. LSA-R. S. 14:14.
*1256 When a defendant pleads the affirmative defense of insanity and claims that the record evidence is insufficient to support a finding of guilt beyond a reasonable doubt, the standard of review is whether under the facts and circumstances of the case a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Roy, 395 So.2d 664 (La.1981); State v. Claibon, 395 So.2d 770 (La.1981); State v. Brown, 421 So.2d 854 (La.1982); State v. David, 425 So.2d 1241 (La.1983), cert. denied 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986); State v. Love, 434 So.2d 448 (La.App. 2d Cir.1983), writ denied 441 So.2d 750 (La. 1983); State v. Hilburn, 512 So.2d 497 (La.App. 1st Cir.1987), writ denied 515 So. 2d 444 (La.1987).[2]
In support of his insanity defense, the defendant offered evidence that he had used drugs, particularly PCP, for about 12 years prior to the instant offense and had been hospitalized several times for drug related psychiatric problems.
In June 1980, defendant became upset after his employment with his father was terminated and his mother called the family's pastor to pray for him. Defendant attacked the pastor. This incident and the belief of certain family members that defendant was using drugs led to defendant being hospitalized for four days at Doctors' Hospital. Dr. James H. Phillips, a psychiatrist who was accepted by the court as an expert in the field of psychiatry, examined defendant while he was at Doctors' Hospital and found him to be extremely angry and hostile. He noted that defendant exhibited paranoia and religiosity and was prone to be grandiose. Dr. Phillips' provisional diagnosis was that defendant was suffering from a paranoid psychosis which he opined was probably secondary to drug use. Dr. Phillips recommended that defendant be transferred to a psychiatric hospital. However, defendant left Doctors' Hospital before the transfer could be effected.
Dr. Phillips next saw defendant in July 1980 at Humana Hospital-Brentwood. Dr. Phillips testified that defendant was very psychotic when he entered the hospital and that because of his inability to distinguish what was real from what was not, he was considered to be potentially dangerous to himself and others. He was placed in a special care unit for two days. Defendant admitted to Dr. Phillips that he had been using "a lot of" PCP and marijuana in the days prior to his admission to Brentwood. Defendant complained of work pressure and Dr. Phillips noted that defendant was having problems coping with everyday situations, was having hallucinations, and was "generally just not functioning". Anti-psychotic medication was prescribed for defendant and he was released after about two weeks. Dr. Phillips' final diagnosis was "adjustment reaction of adult life" and "acute psychosis, secondary to drugs (PCP)". He explained that the latter diagnosis meant psychotic episodes as a result of taking PCP in the past.
In July, 1981 defendant was again hospitalized at Brentwood for about two weeks. Dr. Phillips' diagnosis after this hospitalization was that defendant was experiencing a manic depressive illness. A mental *1257 status report made by Dr. Phillips at that time indicated defendant was having "visions of destruction and death" and believed he was God's representative on earth and could hear God talking to him. Dr. Phillips also noted that defendant exhibited "marked grandiosity and lack of ability to control himself". Defendant denied PCP use at that time. Dr. Phillips testified that defendant:
"was experiencing a major mental illness, a psychotic illness, and I treated it for whatever reason, whether it was a flash-back from PCP or whether it was a manic depressive illness, paranoid schizophrenia. It's all labeled, but his mind is not functioning properly."
Dr. Phillips stated that PCP induced psychosis can result in the person being totally out of touch with reality and totally out of control. He noted that it can be so serious that one would have trouble differentiating between right and wrong. He also stated that PCP users can have flashbacks and suffer from acute psychosis even though they haven't taken the drug lately.
Dr. Phillips testified that if a person were extremely psychotic the chances of his being able to recall anything was "rather slim". He stated that once a person regains a healthy mental state, he can often relate minute details about what happened while he was psychotic. He noted that a PCP user's mental state would change as he detoxifies and that if defendant's mental state had improved by the time he gave the second statement to the police he could have remembered details of the killing.
A clinical psychologist, Dr. Milton I. Rosenzweig, administered various standardized psychological tests to defendant at Dr. Phillips' request. In 1980 Dr. Rosenzweig found that defendant was of average intelligence but that he had a high degree of anxiety and had some resistance to moving into an adult role. He found defendant to be functioning emotionally at an early to middle adolescence level. He noted that people at that level have occasional loss of control over emotional expression, impulsivity and poor judgment, particularly under demand that he cope as an adult. It was Dr. Rosenzweig's opinion that the defendant did not see himself as functioning in an adult role. He diagnosed defendant as suffering from "an adjustment reaction to adulthood with anxiety and drug abuse by history."
In 1981, Dr. Rosenzweig noted that defendant's tests revealed much more loss of emotional control with severe distortion of reality and occasional inability to distinguish reality from fantasy. They also revealed a high level of overreactivity to even minor emotional pressure as well as a good deal of religiosity and delusional thinking. He believed that defendant had suffered a deterioration from his previous level of functioning. Dr. Rosenzweig believed defendant was in need of psychiatric care and that such care would be necessary for the indefinite future.
In August 1982, the defendant created a disturbance in his father's store, the police were called, defendant fled and a highspeed automobile chase ensued. Defendant was eventually apprehended and taken to LSU Medical Center for treatment of superficial gunshot wounds. Dr. Dean E. Robinson, a psychiatrist at LSUMC who was accepted by the court as an expert in the field of psychiatry, testified that defendant was very psychotic upon entering the hospital. He reported that defendant claimed to be experiencing auditory and visual hallucinations and grandiose delusions. Defendant told Dr. Robinson that he used PCP frequently, had been doing this for a number of years, and that he had used PCP the day before his admission. Defendant stated that he had hallucinations "only when I have enough PCP in my system." Defendant told Dr. Robinson that he also used amphetamines and codeine. A drug screen test showed positive for PCP and marijuana. Dr. Robinson stated that at the time he saw him, defendant would have had a lot of trouble distinguishing between right and wrong. He noted that the effects of the drugs and the effects of defendant's delusions would have significantly clouded his judgment.
*1258 Dr. Robinson testified that a person under the influence of PCP in a state of acute intoxication to the point of psychosis would be incapable of distinguishing right from wrong because of impairment of judgment due to the effect of the drug. He further testified that the effects of PCP can make a person extremely mentally ill and that some of the worst cases of mental illness he has ever seen were as a result of PCP. He noted that extreme rage can occur with PCP and that people will commit extremely violent acts, things they normally would not do in their unintoxicated state. He stated that PCP use would really affect judgment and the ability to conform and to be able to see what is right and wrong.
During the four days he was hospitalized at LSUMC, defendant was treated with anti-psychotic drugs and advised to seek follow-up psychiatric treatment. Defendant's discharge diagnosis was "mixed organic brain syndrome secondary to PCP and marijuana abuse."
Dr. Robinson testified that tests for PCP are unreliable. He noted that the thin-layer chromatography test that was performed on defendant the night of the murder was particularly unreliable to detect PCP. He explained that PCP was notorious for not showing up in drug tests. This opinion was reiterated by Dr. Joe Manno, an expert in the field of toxicology and pharmacology. He explained that the thinlayer chromatograph test was not the optimum test to detect PCP because it requires large amounts of the drug to be present in order to detect it. According to Dr. Manno, PCP can be present in the brain and cause effects without being present in the urine or the blood stream. Therefore, the test is not conclusive.
In addition to the medical evidence of his alleged insanity, the defendant also offered the testimony of family members and neighbors. Defendant's father, Oliver Pier, testified that Kenward began working with him in his business around 1974 and that he was very cooperative and reliable, but that prior to Kenward's 1980 hospitalization at Doctor's Hospital he had begun to act "indifferent" and had begun to do things he had not normally done. He described Kenward as acting totally different than he had in the past, hyped and tense. He developed poor work habits and would not report to work as scheduled. On one occasion, Kenward stole $8,000 from the business and then disappeared for ten days. Mr. Pier suspected that Kenward was using drugs and it was Mr. Pier's decision that Kenward be admitted to Doctor's Hospital. Mr. Pier described several incidents of unusual behavior on defendant's part over the next several years and related that he had fired and then re-hired Kenward several different times. Kenward had a supervisory position in his father's security business at the time he murdered Angela. He noted that in the period leading up to the killing Kenward appeared tense and under a lot of pressure. He stated that in the two to three months before the murder, he and Mrs. Pier had to go to defendant's home to pick up Angela on four or five occasions due to defendant's violent behavior.
On cross-examination, Mr. Pier stated that Kenward was "sick" and had a "problem" but admitted that he did not think Kenward was insane and that he allowed defendant to carry a gun and to work as a supervisor in his security business despite his concerns about defendant's behavior.
Eula Pier, defendant's mother, testified that defendant had been a good child, obedient and thoughtful, but underwent a change when he was about eighteen years of age. She attributed this change to drug usage. Mrs. Pier testified that between 1982 and 1985 Kenward was very dedicated to his work with his father and that he and Angela appeared to have a normal family life but that about a month prior to the killing his behavior began deteriorating. She said that at this time his work began to suffer, he appeared "out of it" and began acting paranoid. He felt people were following him and wanted to kill him. She stated defendant incorrectly believed his wife was unfaithful and that he wanted to "have church" with the children and he was telling them their mother was "the devil". She further testified that defendant followed her around for about two *1259 weeks before the murder, stating that he needed to protect her. According to Mrs. Pier, she observed defendant acting strangely the evening immediately prior to the killing and she believed he was on drugs. Defendant appeared to her to be in a daze when she saw him at the family business offices soon after the killing.
Ms. Elgin D. Hill, a friend of defendant's family testified that she had known defendant since he was in junior high school and that he had been a fine boy, polite and helpful, but that his behavior had changed about six or seven years ago and that she suspected he was using drugs. She stated that a few weeks before the killing she observed defendant follow his mother into a beauty shop where he simply stood and stared at her. When Ms. Hill asked defendant what was wrong, he stated "I'm here to protect my mother. Somebody is after her and I'm here to protect her."
Defendant's younger brother, Graylon Pier, testified that defendant had a massive drug problem and had used marijuana and PCP almost daily for about 10-13 years. Graylon testified that Kenward would act crazy after he used PCP and that on occasion he would threaten to kill Graylon. The day before the murder, Graylon said Kenward was "spaced out" and looked "real wild". Graylon saw defendant use PCP three days before the killing.
On Wednesday, September 19, 1985 Angela went to the Caddo Parish Coroner's Office and spoke to Luther Johnson. Mr. Johnson testified that Angela told him that Kenward had been acting in a strange manner, that he had a history of substance abuse and that he became very violent at times. Angela stated that she was afraid for her life and her children's lives. In the preceding twenty-four hours while she was at work, Kenward had been walking around spitting in her face and calling her names. Mr. Johnson testified that he explained to Angela in depth that if Kenward had a mental problem he could be picked up immediately and taken to LSU Medical Center but that if he had a drug problem she would have to make arrangements with a private facility before he could issue papers. He testified that Angela made it quite clear that Kenward had a drug problem rather than a mental problem. His report reflects that Charter Forest Hospital was contacted but that Angela did not have the group insurance number needed to get her husband admitted. She was to have returned to complete the pick up arrangements when she was able to get the insurance information.
Defendant's sister, Elanta Lindsey, testified that she received a phone call from defendant around midnight on Wednesday night. Angela was staying at Elanta's house because, according to Elanta, defendant had been acting "rather strangely". Elanta stated that defendant said no one loved him and that she was his sister and could tell him the truth about the "man who was in the room with Angela". She told him no one was in there. He started crying and kept telling her that nobody loved him. Elanta testified that she had never known Angela to have an affair with another man. Elanta testified that during the conversation defendant also stated that he had "telepathy" and could read minds and that his father was working with the government to "take his mind."
A couple of days before the murder, defendant's parents, concerned about defendant's condition, sought help from defendant's older brother, Oliver Pier, III, who lived in Beaumont, Texas. Oliver, came to Shreveport the day before the killing to talk to defendant. He testified that when he arrived at the store Kenward was present and appeared angry. He took Kenward for a ride in the car to calm him down and to give his mother some relief because Kenward had been following her around for three or four days. Oliver testified that while he and Kenward were together that afternoon he did not want to say anything to antagonize Kenward because of the state he was in.
Oliver testified that he spent the next morning and afternoon, the day of the killing, talking with Kenward. Oliver said that Kenward was angry about his working conditions and his family life. He noted that Kenward and Angela had been *1260 separated a week or two and said that Kenward wanted his family back together. Later, Kenward told Oliver that he was "tired of rats" and that he just wanted to get rid of everything that wasn't any good in his life. Oliver stated that Kenward started to get angry again and that he became uneasy. He stated that when Kenward would become angry he would have a "bulging, piercing" look in his eyes and that his muscles would "just ripple". In the afternoon, the brothers went for a walk and listened to a religious tape Oliver had brought. He stated that Kenward began to cry and said to Oliver "you are my help" but that suddenly Kenward pulled the tape out, put on some hard rock music and started dancing and "gyrating in some wild fashion". Oliver left to go back to Beaumont around 3 p.m.
Patricia Ann Moore testified that she saw Kenward and his mother about 5:30 or 6:00 p.m. on the day of the killing. Mrs. Moore was letting her daughter practice her music lessons on an organ in a chapel owned by defendant's father. Kenward asked Mrs. Moore if the bottle on the alter was blessed oil and after she replied affirmatively, he asked if he could use it. She testified that Kenward then drank some of it and rubbed some of it on his hands.
In response to these witnesses, the state presented the testimony of Dr. Lawrence E. L'Herisson and Dr. Edward H. Leatherman, the members of the sanity commission who had found defendant competent to stand trial. Both doctors were accepted as experts in the field of psychiatry by the court. Both doctors interviewed defendant in November, 1985. They also reviewed the medical records of his prior hospitalizations, his statements to the police, and the police reports. They both opined that defendant knew right from wrong and was not on drugs at the time of the offense. Their opinions were primarily based upon defendant's ability to recall details of the crime and provide information.
Dr. Leatherman stated that defendant was not psychotic when he interviewed him but that he appeared paranoid and made grandiose statements. Dr. Leatherman testified that defendant denied any drug or alcohol intake at the time of the murder and that nothing defendant recounted of his feelings, thoughts and behavior indicated any influence of any drugs. He stated that if someone were really psychotic, particularly from drugs, they would have a problem with orientation, with their memory and with retention and recall. He stated that they would not be able to recount the day's events or circumstances surrounding where they were or what was happening. He noted that defendant was able to describe all the events that occurred on the day of the murder.
Dr. L'Herisson testified that defendant had a "mental problem" at the time of the murder but that he felt defendant was aware of his actions on the night of the murder. He stated that defendant told him that he had been taking drugs but that he had not taken any drugs at that time. Dr. L'Herisson stated that defendant's actions, thoughts, memory and ability to give details convinced him that defendant was not under the influence of drugs. He stated that defendant was not psychotic when he saw him in November. He was however paranoid. He was afraid of the police and believed they were trying to kill him.
Dr. L'Herisson testified that part of the reason that he thought defendant was sane at the time of the offense was that when he interviewed defendant, defendant did not show him anything to make him think otherwise. The doctor stated:
"He didn't show me a blatant type of psychosis. Even though he has paranoid thinking, persons that are paranoid or schizophrenic still know the difference between right and wrong."
On the issue of whether or not defendant was under the influence of drugs at the time he attacked his wife, the State presented the testimony of Dr. George Seiden, a psychiatrist who was accepted by the court as an expert in the field of psychiatry. Dr. Seiden reviewed defendant's prior medical records and read the statements defendant gave to police, but did not interview defendant. Dr. Seiden testified in *1261 response to hypothetical questions based on the facts in evidence. Dr. Seiden was of the opinion that defendant was not under the influence of PCP at the time of the killing but was under the influence at the time of the first statement. He based this opinion on his knowledge of the effect of PCP. He noted that the second statement was a very coherent, step-by-step accounting of events which demonstrated a clear recall of those events. He stated that PCP use causes amnesia during its use and a person would not be able to recall actions performed while under the influence and that if a person were under the influence of PCP at the time of a offense, he would not have been able to give as detailed an account of the night of the killing as defendant gave in the second statement. Dr. Seiden also stated that the content of defendant's second statement demonstrated he knew right from wrong at the time of the offense. Dr. Seiden believed, however, that the first statement was given under the influence of PCP because it reflects psychotic thinking in that defendant did not respond directly to the questions that were asked. He explained the apparent PCP intoxication during the first statement and the lack of it in the second by saying that the PCP must have been taken between the homicide and the first statement.
Regarding the mental status of the defendant on the night of the crime, the state offered the testimony of five persons who had contact with the defendant at the jail on the night he was arrested. Billy Lockwood, an employee of the police department, photographed the defendant that night and collected physical evidence, such as fingernail scrapings, from the defendant. Lockwood testified that defendant did not show any signs of intoxication and did not do anything bizarre in his presence. He described the defendant as merely being "a little uptight". Officers Jennifer Desadier and John A. Coffey were in the central records portion of the police station when the defendant walked in that night. Both Desadier and Coffey testified that the defendant did not appear to be intoxicated. Desadier described his demeanor as normal and stated that he did not appear upset and that he did not do anything bizarre in her presence. Coffey noted that the defendant seemed "very quiet". Officer Mickey Lowe and Detective Larry Trant, both of whom interviewed the defendant that night, testified that the defendant did not appear to be intoxicated or "high" on drugs. Trant stated that the defendant's speech was "very clear" and that he was "very stable". He further stated that defendant was in control of his body motions and did not do anything bizarre. Detective Trant described defendant's demeanor as depressed.
The state also called a nurse and a deputy, both of whom worked at the Caddo Parish Detention Center where defendant was incarcerated, to give testimony regarding defendant's mental state. Neither had observed any bizarre behavior on defendant's part and the guard stated that defendant was a model inmate.
In the present case, the jury, viewing the evidence in the light most favorable to the prosecution, could have found that the defendant failed to carry his burden of proof on the issue of insanity.
While there was agreement among the expert witnesses who testified at trial that defendant suffered from mental problems, none of these experts expressed the opinion that the defendant was legally insane at the time he committed the crime. Defendant offered no medical or psychiatric testimony of his alleged mental defects after his last treatment in 1982. Both Dr. L'Herisson and Dr. Leatherman, testifying for the state, were of the opinion that defendant did know the difference between right and wrong at the time of the offense.
Although the testimony of defendant's lay witnesses brought out incidents of bizarre behavior on the part of defendant during the weeks before the crime, the actions of the defendant on the night of the offense lead to the conclusion that his mental status did not prevent him from being aware of the difference between right and wrong.
The fact that defendant bound and gagged his wife indicates that he was *1262 aware of her resistance and was anxious to avoid detection. This conclusion is supported by several statements defendant made in his confession. Defendant said that while they were in the bedroom, he had asked Angela about her "other boyfriend" quietly because he was trying not to disturb the neighbors and did not want the police to "get into this again". He then stated, "I definitely do not like confinement." He also stated "I had to try to tie her up because she was trying to wake the children up and put them all in there, in the whole corruption." He further explained that "if everybody would have came through there and would have seen her like she was, I would have got all shot up and I knowed what the end would have been." He also stated "I knew that if I was to uncover her head, she would just ah, scream out and then all the corruption again ..." Shortly after the murder, defendant told his daughter, Drawnek, not to go into her mother's bedroom. In his statement, defendant explained, "I didn't want her to see that." The fact that defendant did not want to expose his young daughter to the carnage in the bedroom allows, if not compels, the inference that defendant was possessed of at least a rudimentary sense of "right and wrong" shortly after his misdeed. Additionally, the fact that defendant told the police that he had prayed about killing his wife for six weeks indicates that he must have had at least some doubt about the correctness of his proposed actions. Furthermore, the fact that he had warned his wife "everyday of the last four weeks" negates defendant's scenario of an innocent but crazed person, suddenly overwhelmed by a PCP flashback or a drug-induced psychosis.
Given these facts, coupled with Dr. Seiden's testimony on the lack of PCP use at the time of the commission of the crime, the jury could have rationally concluded beyond a reasonable doubt that the defendant did not prove by a preponderance of the evidence that he was insane when he killed his wife.
This assignment is without merit.
Assignment of Error No. 11
By this assignment, defendant contends that the trial court erred in allowing Dr. Seiden to testify concerning his opinion that the defendant was not under the influence of PCP at the time of the offense, but instead took the PCP afterwards and before the giving of his first recorded statement.
Defendant contends that Dr. Seiden should not have been allowed to give his opinion because he did not have all of the evidence before him concerning defendant's behavior just prior to the time of the offense and because he had never interviewed or evaluated the defendant. Specifically, defendant complains that Dr. Seiden was not privy to any of the testimony from defendant's family members concerning his erratic behavior in the weeks just prior to the offense. Defendant argues that because Dr. Seiden's opinion was based on such limited information, he was allowed to give a misleading opinion to the jury which severely damaged his case.
The trial court is vested with great discretion regarding the competency of experts to venture opinions within their specialized fields. That discretion will be upheld absent a manifestly erroneous decision. State v. Rives, 407 So.2d 1195 (La. 1981).
Dr. Seiden was a qualified psychiatrist who was accepted as an expert by the court. The questions asked of him were hypothetical questions based upon the evidence in the record and he clearly stated the basis for each of the opinions which he gave. Furthermore, the defense had every opportunity to cross examine Dr. Seiden and pose additional hypothetical questions, based upon the evidence. It is the perogative of the jury to accept or reject expert testimony, in whole or in part, and the alleged insufficiency of information on which Dr. Seiden based his opinion goes to the weight to be given to Dr. Seiden's testimony rather than to its admissibility. State v. Watley, 301 So.2d 332 (La.1974); State v. McFadden, 476 So.2d 413 (La.App. *1263 2d Cir.1985), writ denied 480 So.2d 739 (La. 1986).
This assignment is without merit.
Assignment of Error No. 12
By this assignment defendant contends that the trial court erred in failing to give a jury charge requested by defendant.
A requested special charge shall be given by the court if it does not require qualification, limitation or explanation and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. LSA-C.Cr.P. Art. 807; State v. Smith, 414 So.2d 1237 (La.1982). Failure to give a requested charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Marse, 365 So.2d 1319 (La.1978); State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied 456 So.2d 171 (La.1984); LSA-C.Cr.P. Art. 921.
Defendant's special requested charge reads as follows:
If the defendant did not know the difference between right and wrong due to an intoxicated or drugged condition, then such condition may be considered as a mental disease or defect if there is some other evidence of a mental disorder or if there is also evidence of a long term history of intoxication or drug abuse. [State v. Scott, 344 So.2d 1002 (La.S.Ct. 1977); State v. Dean, 487 So.2d 709 (La. App. 5th Cir.1986) writ denied [495 So.2d 300] (La.1986)]
Our examination of the trial judge's charge to the jury reveals that he correctly charged the jury as to both the insanity defense (LSA-R.S. 14:14) and the intoxication defense (LSA-R.S. 14:15). The instructions as given left open for the jury's consideration the question of whether the defendant had developed a "mental disease or defect" due to long-term substance abuse rendering him unable to distinguish right from wrong. We find that the special charge requested by defendant was adequately covered by the general charge and thus the trial court did not err in refusing to give it.
This assignment is without merit.
DECREE
For the reasons assigned, the defendant's conviction is affirmed.

ON APPLICATION FOR REHEARING
Before HALL, SEXTON, LINDSAY, NORRIS and MARVIN, JJ.
Rehearing denied.
NOTES
[1] Assignments of Error Nos. 2-10 and 13 were neither briefed nor argued and therefore are deemed abandoned. Rule 2-12.4, Uniform RulesCourt of Appeal.
[2] In State v. Nealy, 450 So.2d 634 (La.1984), the supreme court stated the standard of review as:

"Whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense." (Emphasis supplied.)
See also State v. Price, 403 So.2d 660 (La.1981) which stated the same standard. We noted in State v. Mitchell, 459 So.2d 91 (La.App. 2d Cir. 1984), writ denied 463 So.2d 599 (La.1985), that the inclusion of the phrase "beyond a reasonable doubt" in addition to "by a preponderance of the evidence" seems to incorrectly alter the proper standard of review and seems out of place. Regardless of how the standard is stated our conclusion in this case is the same: any rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense and that defendant was guilty beyond a reasonable doubt. See also State v. Hathorn, 395 So.2d 783 (La.1981) and State v. Noble, 425 So.2d 734 (La.1983).